# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DANIEL V. MERRY,

     Plaintiff

v.

BRIAN SANDOVAL, et. al.,

     Defendants

Case No.: 3:16-cv-00164-MMD-WGC

**Report & Recommendation of United States Magistrate Judge**

Re: ECF No. 58

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 58, 58-1 to 58-17, ECF No. 60-1 to 60-15.) Plaintiff was given an initial extension of time until February 18, 2019, to file his response. (ECF Nos. 64, 67.) As of February 27, 2019, Plaintiff had still not filed a response, and the court granted Plaintiff a second extension, until March 19, 2019, to file a response. (ECF No. 69.) On March 1, 2019, Plaintiff filed a motion for appointment of counsel. (ECF No. 70.) The court denied the motion, but gave Plaintiff one additional extension of time, until April 22, 2019, to file a response to Defendants' motion for summary judgment. The court advised Plaintiff there would be no further extensions granted barring unforeseen and extenuating circumstances. (ECF No. 71.) As of the date of this Report and Recommendation, Plaintiff has not filed a response.

After a thorough review, it is recommended that Defendants' motion be granted.

# I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC). When he filed his original and first amended civil rights complaints under 42 U.S.C. § 1983, he was proceeding pro se. (ECF Nos. 4, 7.) He was then represented by Dan Winder, Esq. (ECF No. 12.) Represented by counsel, he filed his Second Amended Complaint (SAC) on October 16, 2017. (ECF No. 32.) Mr. Winder subsequently filed a motion to withdraw as counsel, which the court granted. (ECF Nos. 62, 67.)

The events giving rise to this action took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC), though he is now housed at Lovelock Correctional Center (LCC). Defendants are Dr. Karen Gedney, Dr. Marsha Johns, Dr. David Mar, and Caseworker Irvin. Plaintiff alleges that Defendants were deliberately indifferent to his serious medical need in violation of the Eighth Amendment.

First, Plaintiff alleges that he had previously had neck surgery in 2006 and was assigned to lower bunks because of the injuries and instability of his neck. Plaintiff contends that defendant Irvin knew that Plaintiff had a medical condition that required he not be placed in an upper bunk. Shortly prior to July of 2012, Plaintiff avers that Irvin acted with deliberate indifference when she assigned Plaintiff to a top bunk, saying: "Tell someone who cares." Plaintiff fell from the top bunk in July 2012, causing further injury to his cervical spine.

Second, Plaintiff alleges that Drs. Gedney, Mar and Johns knew of the pain and suffering Plaintiff had from the time of the fall from the upper bunk in July 2012 and denied him timely access to neurosurgery, adequate pain management and physical therapy. (ECF No. 32.) In particular, he alleges that he sent a kite to Dr. Gedney on July 22, 2012, which Dr. Gedney ignored for approximately four months until he was allowed to see a neurosurgeon, Dr. Dante Vacca in

November.[1] Plaintiff alleges that he saw Dr. Vacca again in February and March of 2013, and Dr. Vacca recommended surgery in March of 2013. Plaintiff goes on to allege that Dr. Gedney delayed the surgery for a year and four months. Finally, in April of 2014, he had surgery. In December of 2014, Plaintiff alleges that he was referred to a pain specialist, Dr. Black, but Dr. Gedney, Dr. Mar and Dr. Johns ignored his recommendations for pain management. (ECF No. 32.)

Defendants move for summary judgment, arguing: (1) Plaintiff's claims are barred by the statute of limitations; (2) Plaintiff failed to properly exhaust his administrative remedies; (3) Plaintiff's Eighth Amendment rights were not violated; (4) Irvin did not personally participate in the alleged constitutional violation because she did not have authority to medically restrict Plaintiff to a bottom bunk; and (5) Defendants are entitled to qualified immunity.

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on

---

[1] The complaint appears to contain many typographical errors regarding the dates involved. Here, the complaint alleges that Dr. Gedney ignored his kite for four months until Plaintiff was finally allowed to visit the neurosurgeon in November 2014, but four months from when he sent the kite in July of 2012, would have been November of **2012**.

the material facts at issue, summary judgment is not appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-50. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmoving party is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

### III. DISCUSSION

**A. Statute of Limitations**

Section 1983 does not contain its own statute of limitations; therefore, federal courts borrow the statute of limitations for section 1983 claims applicable to personal injury claims in the forum state. *See Wilson v. Garcia*, 471 U.S. 261, 279-80 (1985); *Pouncil v. Tilton*, 704 F.3d 568, 573 (9th Cir. 2012). In Nevada, the statute of limitations for personal injury claims, and therefore section 1983 actions brought here, is two years. Nev. Rev. Stat. 11.190(4)(e); *see also Perez v. Seevers*, 869 F.2d 425, 426 (9th Cir. 1989).

"A statute of limitations begins to run on the date on which the plaintiff's claim 'accrues.'" *Pouncil*, 704 F.3d at 573 (citation omitted). "Federal law determines when a cause of action for a Section 1983 claim accrues and, hence, when the statute of limitations begins to run." *Id.* (citation omitted). Under federal law, a claim accrues "when the plaintiff knows or has reason to know of the injury that is the basis of the action." *Id.* at 574 (citation omitted).

Federal courts apply the forum state's law regarding tolling, including equitable tolling, when not inconsistent with federal law, to civil rights claims filed under section 1983. *Johnson v. State of Cal.*, 207 F.3d 650, 653 (9th Cir. 2000) (citations omitted). "[T]he applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process." *Brown v. Valoff*, 422 F.3d 926, 942-43 (9th Cir. 2005) (citations omitted); *see also Soto v. Sweetman*, 882 F.3d 865 (9th Cir. 2018), *cert. denied*, 139 S.Ct. 480 (Nov. 13, 2018) (inmate is "entitled to tolling while … actively exhausting his remedies[.]").

Defendants argue that Plaintiff's claims stem from a single incident in July of 2012, and was not a continuing violation; therefore, since Plaintiff filed his complaint in March of 2016, Plaintiff's claims are barred by the statute of limitations.

The court disagrees that Plaintiff's claims all stem from the July 2012 incident. Instead a reading of the SAC makes clear that Plaintiff's claims can be separated into several distinct incidents and not one continuing violation, as Defendants' suggest: (1) Irvin's failure to assign him to a lower bunk prior to his alleged fall in July of 2012; (2) Dr. Gedney's alleged delay of his visit to a neurosurgeon for approximately four months (from July of 2012 when he supposedly kited her about his injury); (3) Dr. Gedney's alleged delay of surgery from the time it was recommended by Dr. Vacca in March of 2013, until April of 2014; (4) and the alleged failure of Drs. Gedney, Mar and Johns to follow the recommendations of the pain management specialist that Plaintiff was

6

referred to in December of 2014. Plaintiff would not have known about the delay in seeing a neurosurgeon, the delay in having surgery, or pain management in July of 2012; therefore, those claims could not have accrued at that time. With those parameters, however, the court finds that some of his claims are indeed barred by the statute of limitations.

Insofar as Plaintiff alleges that defendant Irvin violated his rights under the Eighth Amendment by not giving Plaintiff a lower bunk assignment prior to July of 2012 which resulted in his fall from the top bunk, Plaintiff's claim is barred by the applicable statute of limitations. Defendants submit evidence that Plaintiff did not grieve the July 2012 fall incident until he was well outside the time parameters of the governing prison regulation. (ECF No. 58-13 at 7.)

While an inmate may be entitled to equitable tolling of the applicable statute of limitations while he is actively exhausting his administrative remedies, the inmate must still comply with prison regulations regarding the timing for exhausting his administrative remedies. Administrative Regulation (AR) 740 governs the grievance process within NDOC, which must be completed by inmates in order to exhaust administrative remedies. (ECF Nos. 58-14, 58-15, 58-16.) The inmate must proceed through level three levels of review to complete the grievance process: the informal, first and second levels. (*Id.*) An inmate must file a grievance within six months for issues involving medical, tort and civil rights claims. (*Id.*) Plaintiff's claim against Irvin accrued when he allegedly fell on July 22, 2012. He had six months—until January of 2013—to file his grievance. He filed a grievance about falling out of his bed on October 3, 2014, and another grievance about the fall on March 6, 2015. (ECF No. 58-13 at 7, 14). He was well outside the timeframe to initiate a grievance on this issue, and has not submitted any evidence in response to this motion to raise an issue as to whether equitable tolling would apply. Plaintiff filed this lawsuit on March 21, 2016, so his claim

1  against Irvin that accrued on July 22, 2012, is time-barred. As a result, summary judgment should

2  be granted in favor of Irvin.

3      Plaintiff's claim that Dr. Gedney delayed his visit to a neurosurgeon for approximately four

4  months from July of 2012 is similarly barred by the statute of limitations. Taking Plaintiff's

5  allegation as true, Dr. Gedney delayed his visit to a neurosurgeon until November of 2012. He

6  would have had until May of 2013 to grieve this alleged delay. From the evidence Defendants have

7  presented, it does not appear that Plaintiff even grieved this specific issue, and Plaintiff did not file

8  a response to the motion submitting any evidence that would suggest otherwise. Therefore,

9  equitable tolling would not apply. Since Plaintiff filed suit in March of 2016, this claim is also

10 time-barred. Therefore, summary judgment should be granted in Dr. Gedney's favor as to this

11 claim.

12     Next, the court will address the timeliness of Plaintiff's claim that Dr. Gedney was

13 deliberately indifferent to his serious medical needs when she allegedly delayed his surgery from

14 the time it was recommended by Dr. Vacca in March of 2013, until April of 2014. Defendants do

15 not make a specific argument as to this claim being time-barred, and instead argue that the entirety

16 of the claims are time-barred because they stem from the alleged fall in July of 2012. The court

17 will nevertheless address the timeliness of this claim. Presumably, Plaintiff did not know of the

18 full extent of the alleged delay of surgery until he eventually received the surgery in April of 2014.

19 This was within two years of the filing of the complaint in March of 2016. Therefore, the court

20 cannot find on the record before it that this claim is time-barred.

21     Finally, the court finds that Plaintiff's claim that Drs. Gedney, Johns and Mar were

22 deliberately indifferent when they ignored the recommendations of the pain management specialist

23 is not time barred. Plaintiff alleges that he was referred to the pain specialist in December of 2014,

8

so any failure to follow recommendations of the pain management specialist would have occurred after that point. Therefore, Plaintiff's complaint asserting this claim in March of 2016 was timely.

Defendants argue that Plaintiff did not properly exhaust his administrative remedies with respect to any of his claims; however, it is not clear that Defendants submitted evidence regarding whether Plaintiff specifically grieved the alleged delay in surgery or purported failure to follow recommendations of the pain management specialist. Instead of addressing exhaustion, the court will address Defendants' arguments as to the merits, which is dispositive of those claims.

**B. Merits**

**1. Summary of Medical Evidence**

Dr. Mar requested a referral to Dr. Vacca on September 5, 2012, and the referral was approved on September 11, 2012. Plaintiff was initially given an appointment on November 15, but it was subsequently moved to November 30, 2012. (ECF No. 60-4 at 46-48.) An MRI was performed on November 9, 2012, and Plaintiff saw Dr. Vacca for his initial neurosurgical consultation on November 30, 2012. (ECF No. 60-4 at 5-6.) Dr. Vacca recommended a CT scan, and EMG and nerve conduction studies, and then would see him again after the studies were complete. (*Id.*) Dr. Gedney requested the EMG on December 18, 2012, and the CT scan on January 29, 2013. (ECF No. 60-4 at 44-45.) X-rays of the cervical spine were taken on February 1, 2013, and the CT scan took place on February 12, 2013. (ECF No. 60-4 at 29, 43.)

Plaintiff saw Dr. Vacca again on February 15, 2013, and then on March 6, 2013. He requested surgery on the cervical spine on March 15, 2013, and Dr. Gedney submitted a request to the Utilization Review Panel (URP) for surgery on March 20, 2013, which was authorized by the panel. (ECF No. 60-4 at 28, 41; ECF No. 60-5 at 27-28, 32.)

Plaintiff had surgery on May 6, 2013. (ECF No. 60-4 at 9; ECF No. 60-6 at 18-20.) Plaintiff saw Dr. Vacca on July 9, 2013, and reported significant improvement of his pre-operative radicular symptomology, but complained of pain in the upper left side of the neck. He had a recent x-ray, but Dr. Vacca did not have it yet, and asked to see him in follow up in four to six weeks after reviewing the films. (ECF No. 60-6 at 16.) Dr. Johns referred Plaintiff for the follow up on July 16, 2013, and it was authorized on July 23, 2013. (ECF No. 60-6 at 5-6.)

Plaintiff saw Dr. Vacca on August 20, 2013. He complained of left-sided upper neck pain. Dr. Vacca believed there was a loose C2 screw. He recommended proceeding with surgery to address this. (ECF No. 60-6 at 14.) Dr. Vacca requested authorization for the surgery on September 4, 2013. (ECF No. 60-6 at 3.) Dr. Johns referred Plaintiff to Dr. Vacca for the revision surgery on the same day, and it was authorized on September 10, 2013. (ECF No. 60-6 at 12-13.)

Plaintiff had surgery for removal of a left C2 screw, and suture repair of a small dural tear and repair of CSF leak on October 9, 2013. (ECF No. 60-5 at 30-31; ECF No. 60-6 at 40-41.)

Additional imaging was ordered on November 1, 2013 (ECF No. 60-7 at 18), and Plaintiff saw Dr. Vacca on November 7, 2013. He reported that since the October 9, 2013 surgery, he developed weakness in the left arm as well as numbness. Dr. Vacca requested a CT scan, EMG/nerve conduction study and to see him back after those studies were completed. Plaintiff asked about additional medication for pain and Dr. Vacca wrote a prescription for Gabapentin and left it up to Dr. Gedney if that was on formulary and he could start that medication. (ECF No. 60-9 at 12.)

Radiology of the cervical spine was requested and approved on November 20, 2013. (ECF No. 60-5 at 28.) A referral to Dr. Vacca was also made that day, and was authorized. (ECF No. 60-6 at 4.) An EMG was conducted on November 21, 2013, which supported the diagnosis of C5-

7 radiculopathy, and denervation potentials in the biceps and deltoid muscles consistent with a
worsening of the C-5 or C-5/6 radiculopathy. (ECF No. 60-9 at 10-11.)

Plaintiff saw Dr. Vacca for a follow up on January 22, 2014. He requested an MRI of the
brain with and without contrast to determine the cause of new weakness in the left arm, and then
a follow up after the studies were complete. (ECF No. 60-5 at 27.) The MRI was requested by the
prison shortly thereafter, on January 30, 2014. (ECF No. 60-5 at 26; ECF No. 60-6 at 6-7.)

Plaintiff saw Dr. Vacca on March 25, 2014, for a follow up. Dr. Vacca described Plaintiff
as having a complex spine problem, and wanted to review his case with other doctors as he would
likely need a "360 procedure, likely an anterior corpectomy of C3 and C4 with a C2 to C5 fusion."
He stated that he discussed this with Dr. Gedney, and since Plaintiff was in a fair amount of pain
and discomfort, Dr. Vacca suggested increasing his medication for the time being. (ECF No. 60-5
at 24; ECF No. 60-9 at 8.) Dr. Gedney referred him for the surgery on March 25, 2014, and this
was approved on April 1, 2014. (ECF No. 60-6 at 8-9.)

Plaintiff had surgery on April 9, 2014. (*See* notes at ECF No. 60-8 at 43.) Plaintiff saw
Dr. Vacca on May 6, 2014, following his April 9, 2014 decompressive surgery and stabilization
and reduction of his kyphotic deformity. X-rays showed good position of the instrumentation. He
was instructed to follow up in a month with another set of x-rays. He was advised that it was
imperative he wear the collar at all times. At that point, he had started to regain function of the left
deltoid and biceps where he had zero function preoperatively. Dr. Vacca stated that he could
benefit from some physical therapy to help regain strength. (ECF No. 60-8 at 43.)

He was evaluated by physical therapy for left arm weakness on May 8, 2014. (ECF No.
60-9 at 5-6.) Plaintiff saw Dr. Vacca on June 4, 2014, and he described Plaintiff has having slow
improvement in the left deltoid and biceps, but he had regained function and was much improved.

A recent x-ray showed a "little bit of forward movement of the anterior construct[.]" Dr. Vacca would monitor that and if there was any progression, indicated he may need another surgery. (ECF No. 60-9 at 4.)

Plaintiff saw Dr. Vacca for the follow up on July 17, 2014. He was developing increasing kyphotic deformity at the C4-5 level following his surgery, and Dr. Vacca recommended extension of the fusion. (ECF No. 60-5 at 15; ECF No. 60-9 at 3.) A referral for surgery was made that same day, and was approved. (ECF No. 60-5 at 34-35, 44.)

An anterior fusion was performed on July 22, 2014. (ECF No. 60-4 at 50; ECF No. 60-5 at 46; ECF No. 60-8 at 45-48.) In a note dated July 29, 2014, Dr. Vacca indicated that Plaintiff still had weakness in the left deltoid and biceps but it was significantly improved from pre-surgery, and he hoped it would continue to improve. A post-operative CT scan showed excellent appearance of the fusion. (ECF No. 60-9 at 2.)

Dr. Gedney sent correspondence to Dr. Vacca on August 5, 2014, to "bring him up to date on what Plaintiff was doing in NNCC's Regional Medical Facility (RMF)." She noted that Plaintiff was on significant pain medications, "far more than an ordinary patient with similar problems would ever be on." She also stated that he was a known drug addict, who in the past, within the prison, had escalated his behavior in attempts to get the drugs he desires. The prior night, he "basically threatened to commit suicide if he did not get more pain meds." A psychiatry team was called to assess him, and when he found out he would be placed in a suicide watch cell without his belongings, he admitted that he acted that way to get more medication. He also had been observed to pound on himself and torque his neck in a fashion that a person with true neck pain would avoid. His medications at that time included: Oxycodone, with Tylenol every six hours; Valium every six

hours; Duragesic Patch every three days; Neurontin three times a day; and Baclofen, twice a day. (ECF No. 60-13.)

On August 21, 2014, Dr. Vacca noted that Plaintiff was clearly improved after the last surgery. Dr. Vacca recommended a physical therapy evaluation and treatment for the left deltoid and bicep muscle and strengthening and range of motion for the left shoulder. He also noted that the prison had increased his Fentanyl, and was on Oxycontin and Gabapentin as well. (ECF No. 60-8 at 50-51.)

Dr. Johns requested physical therapy for the left shoulder on September 4, 2014. (ECF No. 60-8 at 26.) X-rays of the cervical spine were taken on October 3, 2014. (ECF No. 60-8 at 44.) Plaintiff saw Dr. Vacca for a follow up on October 16, 2014. Plaintiff complained of neck pain, but not radicular arm pain. The numbness in his left hand was worse. He reported that he was on a Fentanyl patch every three days, and Oxycontin, but could not recall what else he was taking. Dr. Vacca thought he could try some therapy for his neck, and would see him in follow up in three months after a review of x-rays and an MRI. He also mentioned possibly setting up a consultation with Dr. Blake regarding pain management. (ECF No. 60-8 at 38.) There is a note that Dr. Vacca spoke with Dr. Blake, who suggested adding Lyrica and possibly a TENS unit. Dr. Vacca also spoke to Dr. Johns and gave her Dr. Blake's suggestions, and the plan was to get a new cervical MRI and see him in three months with another set of cervical spine x-rays. Finally, he stated that Dr. Blake did not suggest increasing his narcotics at that point. (*Id*.)

Dr. Johns requested an MRI of Plaintiff's cervical spine on October 16, 2014, which was authorized on October 28, 2014. (ECF No. 60-8 at 17-18.) Plaintiff was referred for physical therapy by Dr. Johns on November 20, 2014, which was authorized on November 25, 2014. (ECF No. 60-8 at 14-15.) An MRI of the cervical spine was performed on December 1, 2014. (ECF No.

60-8 at 37.) Dr. Johns requested a follow up with Dr. Vacca when an MRI was done on December 8, 2014. (ECF No. 60-7 at 50.) Plaintiff was seen for a shoulder evaluation at Carson Tahoe Therapy for physical therapy on December 10, 2014. (ECF No. 60-8 at 35-36.)

Plaintiff saw Dr. Vacca on December 17, 2014. The recent MRI following the July 22, 2014 revision surgery "look[ed] great." Plaintiff denied any new symptoms, and Dr. Vacca was trying to taper his pain medication, bust "as usual, he is still having complaints." He noted that Plaintiff had been started on Lyrica, "and that ha[d] helped." He would see him in follow up in three months. He recommended a formal pain management consult. (ECF No. 60-8 at 28.)

Dr. Vacca sent Dr. Johns a report on December 23, 2014. Dr. Vacca reported that Plaintiff was neurologically stable, and his recent cervical MRI looked very good. There was nothing more to be done surgically. Plaintiff did continue to complain of a fair amount of pain, and Dr. Vacca believed that he would best be managed in a formal pain management setting, and recommended Dr. Blake to see him on an occasional basis in Reno if he could not see someone in Carson City. He also stated that physical therapy would be beneficial for maximizing return of function in the left arm. (ECF No. 60-8 at 27.)

Dr. Johns requested a TENS unit and physical therapy set up on January 5, 2015, as well as a consultation for pain management with Dr. Blake on January 7, 2015. (ECF No. 6-7 at 39, 48; ECF No. 60-8 at 2.)

Plaintiff saw Dr. Blake for a consultation on February 19, 2015. Plaintiff reported numbness and tingling in his hands, neck pain, dizziness and muscle weakness. Dr. Blake provided medication recommendations. Plaintiff was finding benefit with Lyrica, so it was recommended he continued this, and that he transition to morphine sulfate (from the Fentanyl patch) and he should re-start oxycodone. Dr. Blake also thought Plaintiff was a good candidate for trigger point

injections. There is an addendum that states that Dr. Blake spoke with Dr. Johns at the prison, and Plaintiff was not able to start morphine sulphate (MSER) due to prison policy. Dr. Blake recommended the transition of all medications to methadone, and advised that he may need to adjust by 5-10 mg. (ECF No. 60-11 at 5-9, 10-13.)

On April 24, 2015, Dr. Vacca noted that he reviewed a March 5, 2015 cervical spine x-ray, and said Plaintiff would follow up in six months with a new x-ray. (ECF No. 60-10 at 25.)

Plaintiff saw Dr. Vacca on September 24, 2015, for a follow up. He noted that Plaintiff had regained his deltoid and bicep function. He was seeing Dr. Blake for pain management, and Plaintiff reported that had been helpful. (ECF No. 60-10 at 23-24.)

Plaintiff saw Dr. Vacca on March 19, 2015, who noted that Plaintiff continued to improve neurologically and had good function of the deltoid and biceps. He had chronic pain issues and saw Dr. Blake, who recommended some treatment. He had limited range of motion in the neck, as was expected. He was neurologically stable. X-rays were ordered and he was to follow up in six months. Dr. Vacca indicated that he would have Dr. Blake contact Dr. Johns at the prison regarding medication recommendations and that Plaintiff would also see Dr. Blake for trigger point injections. (ECF No. 60-10 at 40, 42-43.) It appears the notes from Dr. Blake are attached. Dr. Blake noted opioid exposure for over one year, and that Plaintiff was on a Fentanyl patch and Oxycodone. He recently tapered down but had an increase in pain. He noted fatigue with Lyrica, but had significant benefit with his hand numbness. (ECF No. 60-10 at 41.)

Plaintiff saw Dr. Blake on April 13, 2015, and reported he had been on methadone but did not have much benefit, and was angry and irritated. Trigger point injections were performed. Dr. Blake recommended a trial of Oxycodone Elixir while in the medical ward, and if tolerated

he could potentially stay on it in general population. He could also do a trial of morphine elixir. He was to follow up in two to three months. (ECF No. 60-10 at 45-48.)

Plaintiff saw Dr. Blake on March 7, 2016 for pain management. He noted overall improvement. He was working, and was able to sweep and mop for the most part. He would have the most significant pain midday. (ECF No. 60-10 at 26.) He was taking methadone, Elavil, Neurontin, ibuprofen and Tegretol. Trigger point injections had seemed beneficial. Plaintiff was described as a high-risk opioid candidate, but seemed to take his medications appropriately with appropriate pain control. He recommended methadone, Gabapentin, and was to continue Tegretol, Amitriptyline and ibuprofen. (ECF No. 60-10 at 26-30.)

Plaintiff saw Dr. Blake on July 15, 2016, regarding chronic pain symptoms. He reported that overall, he had improved since his last appointment. He had some medication changes. He attributed improvement to his medication regimen: methadone, Elavil, Neurontin, ibuprofen, and Tegretol. He was walking every morning. He was to continue his medications and follow up in six to eight weeks. (ECF No. 60-10 at 14-17.)

**2. Eighth Amendment Standard**

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in

further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104);  *see also Akhtar*, 698 F.3d at 1213.

Here, there is no question Plaintiff had a serious medical need related to his cervical spine. The records reflect that he underwent four surgeries on his cervical spine between May of 2013 and July of 2014.

The question then, is whether Defendants "acted with deliberate indifference to that need." *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

**3. Analysis**

The court has reviewed all of the medical records submitted by Defendants, as well as the expert report from David Hellerstein, M.D., Ph.D.[2] (ECF Nos. 58-7, 60-1 to 60-15), and concludes

---

[2] Dr. Hellerstein earned his bachelor's degree from Harvard College, a PhD from Stanford University, and Medical Degree from the University of California, San Diego, and did his residency training in internal medicine at the University of California, San Francisco. He is the former Chief Medical Officer for Medical and Public Health Programs for the California Department of Corrections and Rehabilitation. He is currently the Inspector General for that department. He also reviewed all of the records and opines that Defendants were responsive and timely in managing Plaintiff's serious medical conditions, ordering neurosurgical referral and pain management appropriate to his needs, and responded appropriately to the recommendations of specialists to whom he was referred.

1  there is no evidence that Defendants were deliberately indifferent to his serious  medical need.
2  Instead, the records demonstrate, and Dr. Hellerstein confirms, that Plaintiff received timely and
3  appropriate care.

4      Defendants adequately responded to Plaintiff's complaints of pain. He was given timely
5  referrals to specialists, and the specialists recommendations were followed. He received four
6  surgeries on the cervical spine by Dr. Vacca that were approved and took place within a reasonable
7  time of being recommended. He was referred to physical therapy and a pain management specialist
8  where he received pain medication management and trigger point injections for his complaints of
9  chronic pain. Despite Plaintiff's claims, the records reflect that Dr. Blake's recommendations were
10 followed. Where a specific medication recommendation was not supported by prison policy, or
11 because Plaintiff had a history of drug seeking behavior, appropriate adjustments were made and
12 Plaintiff seemed satisfied with this course of treatment according to the progress notes.

13     Plaintiff has not responded to the motion to present any evidence to the contrary. Therefore,
14 summary judgment should be granted in Defendants' favor.

15     As a result of this recommendation, the court need not reach Defendants' argument
16 regarding qualified immunity.

17                    **IV. RECOMMENDATION**

18     IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING**
19 Defendants' Motion for Summary Judgment (ECF No. 58).

20     The parties should be aware of the following:

21     1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to
22 this Report and Recommendation within fourteen days of being served with a copy of the Report

23 _____

18

and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

      2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

      DATED:  June 10, 2019.

_____
William G. Cobb
United States Magistrate Judge